[No. B004344. Second Dist., Div. Five. Apr. 17, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLEN KENT SHERMAN, Defendant and Appellant.

**COUNSEL**

Jacalyn T. Drexler, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John R. Gorey and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—In 1979, Allen Kent Sherman (appellant) was convicted of violating section 288 of the Penal Code (child molestation). After he was found to be a mentally disordered sex offender (MDSO) pursuant to Welfare and Institutions Code section 6300,[1] he was committed to the Department of Mental Health for a maximum of five years.

Before his term expired, the People filed a petition in the superior court to extend appellant's commitment pursuant to section 6316.2.[2] The petition

---

[1]Unless otherwise noted, all statutory references hereinafter are to the Welfare and Institutions Code.

[2]This section, together with section 6300, was repealed by Statutes 1981, chapter 928, section 2, page 3485. Section 3 of that repealer legislation reads: "Nothing in this act shall be construed to affect any person under commitment under Article 1 (commencing with Section 6300) of Chapter 2 of Part 2 of Division 6 of the Welfare and Institutions Code prior to the effective date of this act. It is the Legislature's intent that persons committed as mentally disordered sex offenders and persons whose terms of commitment are extended under the provisions of Section 6316 of the Welfare and Institutions Code shall remain under these provisions until the commitments are terminated and the persons are returned to the court for resumption of the criminal proceedings.

"The Legislature finds and declares that the purposes of the mentally disordered sex offender commitment have been to provide adequate treatment of these offenders, adequate controls over these persons by isolating them from a free society, and to protect the public from repeated commission of sex crimes. In making the repeal of the mentally disordered sex offender commitment procedures prospective only, the Legislature finds and declares that it is necessary to retain persons under this commitment who committed their crimes before the effective date of this enactment in order to have proper control over these persons and to protect society against repeated commission of sex crimes and that other enactments in the 1979-80 Regular Session of the Legislature and the 1981-82 Regular Session of the Legislature would yield prison terms which would provide this protection to society without the need to retain the mentally disordered sex offender commitment."

was sustained and appellant's term of hospitalization was extended two years.

Contrary to appellant's contentions, we hold that extension of his commitment is not cruel and unusual punishment and is not a denial of equal protection.

## TRIAL COURT PROCEEDINGS

In several proceedings below,[3] culminating in a nonjury hearing in which the petition for extended commitment was granted, the following testimony was elicited:[4]

Dr. Kaushal Sharma, a medical doctor and expert in psychiatry, narrated that based on his examination of the appellant, ". . . there is no treatment program I know of which would reasonably change his sexual orientation. [H]is sexual orientation is not going to be significantly—respond to any psychiatric treatment, and I know of no such treatment." Later, he responded to a question: "All I am saying is there is no reasonable possibility of reasonably successful treatment to significantly decrease the issue of dangerousness as related to children for Mr. Sherman."

Dr. Ronald Markman, also a medical doctor, and an expert in psychiatry, was asked: "In your opinion is Mr. Sherman—will he benefit from treatment in a—from psychiatric treatment in terms of his sexual orientation?" He answered: "Not with current modalities that are available, no. I think that the condition is too long standing and too ingrained, and the prognosis for any change would really be only a function of aging and time."

Dr. Sharma again: "In my opinion Mr. Sherman suffers from a mental disorder known as pedophilic disorder, homosexual type." When asked whether as a result of his condition appellant is predisposed to commit sexual offenses, Dr. Sharma responded: "It's my opinion that he is predisposed to the commission of the same or similar offenses."

The questioner then defined "bodily harm" as ". . . any touching of the person of another against his will with physical force in an intentional, hostile, and aggravated manner or projecting of such force against his per-

---

[3]Appellant filed a motion to dismiss the petition for extended commitment and a petition for habeas corpus, which were denied. Respondent's petition for extended commitment was granted. The critical theme was the same in each of the trial court episodes. For that reason, the psychiatric testimony, portions of which were received at different hearings, is presented en bloc.

[4]These psychiatrists were appointed by the court pursuant to Evidence Code section 730.

son."[5] With that definition in mind, Dr. Sharma responded to a question whether the appellant represents a substantial danger of bodily harm to others in the following words: "Taking that definition of 'bodily harm' into consideration, I believe in my opinion Mr. Sherman represents a substantial danger of bodily harm to others."

Dr. Markman was asked for an opinion as to whether appellant's mental condition predisposes him to the commission of sexual offenses. The doctor answered: "It was my opinion that clearly is so, and both the history and even Mr. Sherman's own narration demonstrates that."

The district attorney then proposed the same definition of "bodily harm" that was propounded to Dr. Sharma, and in response thereto Dr. Markman said, "Using that definitional framework, . . . he does represent a substantial danger of bodily harm." Reasons for this opinion were subsequently advanced by this witness.

The court also read and considered a letter from the Deputy Director of Clinical Services for the Department of Mental Health stating that defendant suffers from a mental disease, defect, or disorder, and as a result thereof, is predisposed to the commission of sexual offenses to such a degree that he presents a substantial danger of bodily harm to others. Written reports of Dr. Sharma, Dr. Markman and a summary from Patton State Hospital, read and considered by the court, generally verify the opinions and conclusions above noted.

In granting the petition for extended commitment, the trial court found that appellant "suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder, is predisposed to the commission of sexual offenses to such a degree that he presents a substantial danger of bodily harm to others."[6] An order extending commitment was made and this appeal followed.

### EXTENSION OF APPELLANT'S COMMITMENT DOES NOT CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

There are two prongs to the cruel and unusual punishment assertion.[7]

Appellant first argues that pursuant to section 6316.2, subdivision (i), an affirmative obligation is placed upon the Department of Mental Health to

---

[5]This definition is found in *People* v. *Bradley* (1983) 146 Cal.App.3d 721, 726 [194 Cal.Rptr. 549]. In *Bradley,* a case in which a jury found that appellant's mental condition met the standard for an extended MDSO commitment, this instruction was approved, and the order of extended commitment was affirmed.

[6]This is the statutory finding required by section 6316.2, subdivision (a)(2) in order to extend the term of commitment.

[7]Appellant makes no argument that the evidence is insufficient to support the findings of the trial court.

provide "treatment for the underlying causes of the person's mental disorder." Appellant's mental disorder that brings him under the purview of the MDSO statutes is pedophilia. Since Drs. Sharma and Markman have testified that there are no known treatment modalities for appellant's pedophilia with its concomitant predisposition to recidivism, he, in essence, is not receiving any treatment whatsoever for his condition. In turn, appellant urges that this lack of treatment exposes him to a potentially indefinite commitment, through a series of extensions well in excess of the confinement he would suffer if he were not an MDSO but just an ordinary criminal defendant. Lastly, appellant notes that the continued incarceration of a defendant beyond his maximum prison term represents cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 7 of the California Constitution.[8]

In support of his position, appellant relies upon *Ohlinger* v. *Watson* (9th Cir. 1981) 652 F.2d 775. In that case, Ohlinger and Haddon, each convicted of sodomy, were sentenced to indeterminate life sentences in lieu of 15-year maximum sentences under the state sodomy statute in Oregon. Both were housed in Oregon State Prison where a form of rehabilitative treatment for their mental condition was afforded.

Basing its decision on federal principles, the circuit court held that the appellants were being denied due process in violation of the Fourteenth Amendment and were being subjected to cruel and unusual punishment under the Eighth Amendment. The court reasoned that as a quid pro quo for a longer confinement but under different terms than if the defendants were sentenced under regular criminal statutes, the state has determined that it no longer has an interest in punishing defendants but rather in attempting to rehabilitate them.

The level of treatment sufficient to pass constitutional muster is that which will give each defendant a realistic opportunity to be cured or to improve his or her mental condition. "Adequate and effective treatment is constitutionally required because, absent treatment, appellants could be held indefinitely as a result of their mental illness, while those convicted [of purely criminal acts] need only serve the fifteen-year maximum term." (*Ohlinger* v. *Watson, supra,* 652 F.2d at p. 778.)

There are substantial differences between *Ohlinger* and the case at bench. Ohlinger, for example, received no treatment of any kind for 10 years.

---

[8]Amendment Eight of the United States Constitution prohibits "cruel *and* unusual punishment"; article I, section 7 of the California Constitution restricts the explanation of cruel *or* unusual punishment. Appellant makes no point of this difference.

Neither defendant had used force against his victim in connection with their unlawful sexual activities. Both Ohlinger and Haddon required intensive individual therapy which was not available at Oregon State Prison, where they were incarcerated, but was available at Oregon State Hospital. Staff and services at Oregon State Prison were well below minimum standards proposed by the American Corrections Association.

Here, appellant at all times has been committed to the Department of Mental Health in a hospital setting. No contention is made or argument advanced that "state of the art" treatment has not been given to appellant or that other pedophiliacs have not benefited therefrom. Appellant has availed himself of the offered treatment, but his pedophilia is chronic and difficult to treat. Moreover, unlike Ohlinger and Haddon, appellant is not held under an indeterminate life sentence. After serving the maximum period of confinement provided for non-MDSO defendants, appellant's further commitments are each limited to two years' duration, and unless another extension petition is filed and granted, appellant will be released. This right to biannual review is surrounded by due process rights guaranteed under the federal and state Constitutions for criminal proceedings. This includes the right to counsel, right to a jury trial, criminal case discovery procedure, trial within 30 days prior to his scheduled release date, and all other "applicable constitutional guarantees." (§ 6316.2, subds. (c), (d), (e).) In *Ohlinger,* we do not know under what circumstances the appellants would have been released. The circuit court ordered that appellants be transferred to the Oregon State Hospital or some other adequate facility, and, of course, did not address the issue here, as appellant puts it, of the "[un]availability of potentially beneficial treatment."

We note in passing, and appellant concedes, that amenability to treatment is not a condition precedent to an order of extended commitment. Section 6316.2, subdivision (j), enacted in 1979 and in existence at the time of these proceedings, reads: "Amenability to treatment is not required for a finding that any person is a person as described in subdivision (a), nor is it required for treatment of such person. Treatment programs need only be made available to such person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."[9]

---

[9] A person found to be MDSO could not initially be committed for confinement in a state hospital or other appropriate treatment facility unless a finding was made "that the person could benefit by treatment." (§ 6316, subd. (a)(1).) The 1979 amendment to section 6316.2 makes it abundantly clear that the Legislature had no intention to make such a finding a prerequisite to a subsequent recommitment.

In *People* v. *Poggi* (1980) 107 Cal.App.3d 581 [165 Cal.Rptr. 758], an MDSO appellant argued that an extended commitment order must be reversed in the absence of a finding that appellant was "amenable to treatment." In rejecting this contention, the court stated: "Appellant attempts to read into the statute a requirement for an additional finding, that he be amenable to treatment. [Fn. omitted.] The statute contains no such requirement by its express terms. As a matter of fact, in 1979 the Legislature added subdivision (j) to section 6316.2, to state expressly that a finding of amenability to treatment is *not* required." (*Id.*, at p. 587; italics in original.)

Faced with this appellate ruling and the express statutory disclaimer of the need for amenability to treatment (§ 6316.2, subd. (j)) appellant attempts to draw a distinction between "amenability to treatment" and "availability of potentially beneficial treatment." He contends, in short, since he can't be successfully treated, he should now be released. His argument is an exercise in sophistry. It is self-evident that if a defendant is amenable to treatment, existing modalities are potentially beneficial to him. If he is not amenable to treatment, existing modalities are not potentially beneficial but, as expressly provided in section 6316.2, subdivision (j), "Treatment programs need only be made available to such person. Treatment does not mean that the treatment be successful or potentially successful, . . ."

"To adopt the position advocated by appellant, we would have to say the Legislature intended that even though a mentally disordered sex offender is predisposed to the commission of sexual offenses and dangerous to the public, he must nevertheless be released if there is no prospect of curing him. The very statement of the proposition shows its absurdity." (*People* v. *Poggi, supra,* 107 Cal.App.3d at p. 588.)

█ As the second prong of his argument, appellant continues that although the thrust of the original MDSO provisions were adequate treatment, adequate control and protection of the public from repeated commissions of sex crimes, the repealer legislation now emphasizes control and protection of society even as to those remaining under MDSO commitment. This public policy is being served by an overall increase in present prison terms for recently committed sex offenses. Keeping persons such as appellant in custody beyond the equivalent prison term cannot be justified in the case of MDSO's held under section 6316.2 because they are being subjected to cruel and unusual punishment.

This argument is strikingly similar to one advanced and rejected in *Baker* v. *Superior Court* (1984) 35 Cal.3d 663 [200 Cal.Rptr. 293, 677 P.2d 219].[10]

---

[10]Appellant's argument is positioned under the rubric cruel and unusual punishment. It is equally applicable to our discussion of the denial of equal protection contention, *infra*.

"Petitioners contend that extension of their MDSO commitments denies them equal protection of the laws. They claim impermissible discrimination in that persons who commit a sex offense and are convicted after January 1, 1982, are not subject to an indefinite—potentially lifelong—civil commitment and are instead imprisoned for a fixed period of time under the determinate sentence law.

"No significant constitutional problem is presented by the prospective repeal of the MDSO laws. 'A refusal to apply a statute retroactively does not violate the Fourteenth Amendment.' [Citation.] '[T]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time.' [Citations.]

"Legislation almost inevitably creates some disparities and the differential results which follow the termination of the MDSO program appear no different than those which inevitably accompany either the establishment or elimination of any statutory treatment program. [Citation.]" (*Baker* v. *Superior Court, supra,* 35 Cal.3d at pp. 668-669.)

"As we have seen, the Legislature decided in 1981 that the MDSO program was not sufficiently successful to warrant continuation; it therefore provided that no one convicted after the enactment became effective should be committed to the MDSO program. As to those persons 'other enactments . . . would yield prison terms which would provide . . . protection to society. . . .' [Citation.] [Fn. omitted.] At the same time, the Legislature decided that the program should not be ended for those persons already committed as MDSO's, apparently concluding that it would be inimical to the public safety simply to end the program altogether, resulting in the release of many still dangerous persons.

"When the Legislature eliminated the MDSO program, petitioners had already been committed and were serving their initial term imposed pursuant to section 6316.1; they all faced the possibility of an extension if, at the end of the maximum term prescribed for the sex offense, they met the criteria of section 6316.2. The repeal of the MDSO law did not affect the commitment which had been imposed in lieu of criminal sanctions; the commitment did not become more onerous than it had been. Petitioners were and still are entitled to release when no longer dangerous regardless of the period of confinement for the analogous prison term now specified for the offenses. Stripped to its essentials, petitioners' claim challenges the basic validity of all prospective lawmaking." (*Id.,* at pp. 669-670.)

Aside from the broad contention that the potential for indeterminate commitment is in and of itself cruel and unusual punishment, appellant articu-

lates no other facts in support of his argument. We have earlier noted that at all times appellant has been placed in a hospital setting and that he is being treated. Moreover, as we shall discuss *infra*, it is not unusual for mentally ill persons who are dangerous to be subject to potential confinement for indefinite periods of time. We conclude that the MDSO extension commitment statutes do not impose cruel and unusual punishment upon appellant. (See *People* v. *Poggi, supra,* 107 Cal.App.3d at pp. 591-592.)

### THE EXTENDED COMMITMENT OF APPELLANT DOES NOT CONSTITUTE A DENIAL OF EQUAL PROTECTION

Appellant argues that without a showing that he poses a threat of bodily injury, application of the lesser standard of "bodily harm" approved in *People* v. *Bradley, supra,* 146 Cal.App.3d 721, constitutes an unconstitutionally different treatment from other "similarly situated individuals"—as compared to the showing of "dangerousness" statutorily required to keep them confined. These statutes are: (1) section 5008, subdivision (h)(2)(i)—extended commitment of a mentally incompetent criminal defendant who poses a "serious threat to the physical well-being of another person"; (2) section 5300—extended commitment for a criminally committed person who "presents a demonstrated danger of inflicting substantial physical harm upon others"; (3) section 6500—commitment of a mentally retarded person who is a "danger to himself or others"; (4) Penal Code section 1026.5, subdivision (b)(1)—extended commitment of a criminally insane defendant who represents "a substantial danger of physical harm to others." Since he has served the punishment portion of his confinement, he should be afforded the same standard of dangerousness applicable to other similarly situated persons. His argument is without merit.

In comparing definitions of dangerousness under Penal Code section 1026.5, subdivision (b)(1), and section 6500, our Supreme Court in *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176 [167 Cal.Rptr. 854, 616 P.2d 836] concluded that: "The distinctions among those definitions appear more form than substance." In ruling on the standard necessary for creating or renewing a conservatorship for an incompetent criminal defendant under section 5008, subdivision (h)(2), the court concluded that the "substantial danger of physical harm to others" test would be used, which is identical to Penal Code section 1026.5, subdivision (b)(1). We conclude that the degree of dangerousness described in section 5300 is identical in substance if not in form to the standard of the criminally insane defendant under Penal Code section 1026.5, subdivision (b)(1).

However, we need not compare these degrees of dangerousness with the *Bradley* standard governing MDSO's.

■ Our ". . . California Supreme Court has recently indicated that MDSO's may be subjected to a period of extended commitment once the maximum term of punishment has expired without violating equal protection of the laws if the People establish that the person committed remains a danger to the health and safety of himself or others. [Citation.]

"Commitment of MDSO's to a state hospital is for the purposes [*sic*] of treatment not punishment. [Citation.] Implicit in the MDSO statutory scheme is the legislative finding that certain MDSO's shall be committed to a state mental health facility because of their mental status, i.e., because they are in need of and will benefit by the special treatment afforded there. This difference in mental condition between the classes of ordinary offenders, 'non-treatable' MDSO's and 'treatable' MDSO's is an adequate constitutional ground for the difference in the terms of commitment of the classes, applying the requisite 'compelling interest' standard since personal liberty is at stake. [Citations.]" (*People* v. *Henderson* (1980) 107 Cal.App.3d 475, 489 [166 Cal.Rptr. 20].)

There is no disparity in treatment among those individuals who were properly committed to the MDSO treatment program; all persons so committed are subject to the extension of their commitment under the procedures provided in the new legislation. (*Baker* v. *Superior Court, supra,* 35 Cal.3d at p. 669.)

### DISPOSITION

The order of extended commitment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 25, 1985.